THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| DANIEL B. and D.B.,<br><br>  Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE, UNITED BEHAVIORAL HEALTH, and KEYCORP MEDICAL PLAN,<br><br>  Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [40] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING IN PART AND GRANTING IN PART [41] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00606-DBB-CMR<br><br>District Judge David Barlow |

Before the court are the parties' cross-motions for summary judgment.[1] Plaintiffs Daniel B. and D.B. (collectively "Plaintiffs") seek to recover benefits from Defendants United Healthcare ("United"), United Behavioral Health ("UBH"), and KeyCorp Medical Plan (the "Plan") (collectively "Defendants") under 29 U.S.C. § 1132, the Employee Retirement Income Security Act ("ERISA").[2] Having considered the briefing, the court finds that oral argument is unnecessary.[3] For the reasons below, the court grants in part and denies in part both motions.

## BACKGROUND

Daniel B. was a participant in a group medical plan provided by his employer, KeyCorp.[4] As Daniel B.'s dependent, D.B. was a Plan beneficiary.[5] KeyCorp "delegated the fiduciary

---

[1] Def. Mot. for Summ. J. ("Def. MSJ"), ECF No. 40, filed Dec. 10, 2021; Pl. Mot. for Summ. J. ("Pl. MSJ"), ECF No. 41, filed Dec. 10, 2021.
[2] Compl. at ¶¶ 48–53, ECF No. 2, filed Aug. 31, 2020.
[3] *See* DUCivR 7-1(g).
[4] Administrative Record ("AR") 10, 505.
[5] AR 10.

responsibility for medical services coverage determinations under all [m]edical Plan options to" United, the claims administrator.[6] United "maintain[ed] the sole and exclusive discretion and authority to apply, construe and interpret all provisions and terms of the Plan and its coverage options, and to grant and/or deny any and all claims for Plan benefits."[7]

**Plan Coverage and Claims Process**

The Plan covers outpatient and inpatient mental health and behavioral health services for the following levels of care: inpatient treatment, residential treatment, partial hospital program, intensive outpatient, and outpatient treatment.[8] "Covered health services" are "[p]rovided for the purpose of preventing, diagnosing, or treating . . . Mental Illness, substance-related and addictive disorders or their symptoms."[9] The Plan does not limit coverage for essential benefits that include "hospitalization; . . . mental health and Substance-Related and Addictive Disorders Services (including behavioral health treatment); . . . rehabilitative and habilitative services . . . ; [and] preventative and wellness services."[10] But the Plan excludes "[e]ducational/behavioral services that are focused on primarily building skills and capabilities in communication, social interaction and learning."[11] United allows two internal appeals for denials of coverage.[12] Members may seek an external review after exhausting internal appeals.[13]

**Mental Health Level of Care Guidelines**

UBH administers claims for mental health benefits.[14] Under UBH's guidelines, an inpatient facility is defined as a "structured hospital-based program which provides 24-hour/7-

---

[6] AR 8–9, 134, 2947.
[7] AR 129.
[8] AR 64.
[9] AR 135.
[10] AR 24.
[11] AR 92–93.
[12] AR 103.
[13] AR 104–07.
[14] AR 64; Def. MSJ 6; Compl. at ¶ 3.

day nursing care, medical monitoring, and physician availability; assessment and diagnostic services, active behavioral health treatment, and specialty medical consultation with an immediacy needed to avoid serious jeopardy to the health of the member or others."[15] A Residential Treatment Center ("RTC") is a "sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient."[16] At both types of facilities, treatment "is focused on addressing the factors that precipitated admission . . . to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care."[17] Below are relevant excerpts from the Level of Care Guidelines for Mental Health.[18]

*Common Admissions Criteria for All Levels of Care*

The member's condition and proposed service(s) are covered by the benefit plan.

AND

The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care.[19]

*Inpatient Admission Criteria*

Common admission criteria for all levels of care.

AND

The factors leading to admission, and /or the member's history of response to treatment suggest that there is imminent or current risk of harm to self, others, and/or property which cannot be safely, efficiently, and effectively managed in a less intensive level of care.[20]

---

[15] AR 200.
[16] AR 197–98.
[17] AR 198, 200.
[18] For a complete list, see AR 189–201.
[19] AR 190.
[20] AR 200.

*Residential Treatment Center Admission Criteria*

Common admission criteria for all levels of care.

AND

The member is not in imminent or current risk of harm to self, others, and/or property.

AND

The factors leading to admission cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors.[21]

*Common Continued Service Criteria for All Levels of Care*

The admission criteria continue to be met and active treatment is being provided.

AND

The factors leading to admission have been identified and are integrated into the treatment and discharge plans.[22]

*Inpatient and RTC Continued Service Criteria*

Common continued service criteria for all levels of care.

AND

Treatment is not primarily for the purpose of providing custodial care.[23]

*Common Discharge Criteria for All Levels of Care*

The continued stay criteria are no longer met.[24]

---

[21] AR 197–98.
[22] AR 190.
[23] AR 198, 200.
[24] AR 190.

**Utah Neuropsychiatric Institute**

*Admission*

At the time of the relevant events, D.B. was a junior in high school.[25] On October 9, 2017, D.B. overdosed on prescription drugs and was taken to a hospital inpatient psychiatric ward.[26] First responders and providers noted that D.B. was resistant to treatment, tried to run, and was extremely aggressive.[27] The hospital transferred D.B. to a wilderness program.[28] D.B. was admitted to the program but he was discharged forty-eight hours later because of violence.[29] D.B. was then sent to the Utah Neuropsychiatric Institute ("UNI").[30] There, D.B. entered the Comprehensive Assessment Treatment ("CAT") program on October 24 for "[i]nability to maintain safety in less restrictive setting[,] [s]uicidal ideation and aggression/harm to others[,] and [s]ubstance use."[31] UNI also indicated a "[r]isk of early relapse with premature discharge from the inpatient setting and risk of violence."[32]

*Initial Coverage*

UBH covered D.B.'s care at UNI from October 24, 2017 to November 16, 2017 through a series of authorizations.[33] The first authorization noted that D.B. was involuntarily admitted to UNI with a diagnosis of severe major depression.[34]

---

[25] AR 575.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] AR 608.
[30] AR 575.
[31] *Id.*
[32] AR 582.
[33] *See* AR 450–98.
[34] AR 274.

*Care from October 24 to November 16*

Shortly after admission, UNI conducted a psychiatric history and physical exam. The report noted a risk of violence, the presence of several suicide risk factors, and active aggressive behavior.[35] However, UNI also found no acute medical issues and recommended that D.B. participate in group and individual therapy.[36] In a progress update on November 2, UBH "found clinical concerns . . . [,] unclear [causes] of violent behavior[, and] concerns as to safety of others not being addressed considering trigger for last violence was being told he was going home."[37] D.B.'s physician told UBH that "severe [Major Depressive Disorder], severe ADHD (hyperactive), severe drug use (primarily cannabis)" were contributing to D.B.'s behaviors, and D.B. thought that he could leave "if he were violent."[38] The physician wrote that D.B.'s "severe depression and impulsivity need to be addressed[,]" D.B. "appears to be exhibiting antisocial behaviors[,]" and UNI would do further testing when D.B. was more functional.[39]

UBH indicated that in early November, D.B. had to be placed in restraints because he kicked a UNI staff member.[40] Yet by November 6, D.B.'s education consultant was "looking for RCT [sic] and discussing options w[ith] parents."[41] On November 7, UNI reported that D.B. was "on the edge of being violent."[42] UNI needed to finish psychological testing, but D.B. was "guarded and defiant so testing [wa]s difficult."[43] As of November 13, UBH had asked if there was a bed yet at a RTC or wilderness program and planned to meet with the education

---

[35] AR 584–86.
[36] AR 586.
[37] AR 289–90.
[38] AR 291.
[39] *Id.*
[40] AR 316.
[41] AR 293.
[42] AR 298.
[43] *Id.*

consultant.[44] UBH described D.B.'s mental health as: "upset about parent's letter,[45] affect tearful[,] constricted and sad, mood irritable, . . . no [suicidal or homicidal ideations], . . . limited insight as to his aggressive [behavior], . . . talks about aggression."[46] Relaying a social worker's notes, UBH described that D.B. was "not doing well, very emotional at times, tearful . . . . Appears to be quite depressed."[47]

UNI completed neurological testing on November 15.[48] D.B. was diagnosed with "ADHD, Combined Presentation; Cannabis Use Disorder, moderate; and Major Depressive Disorder, moderate."[49] The doctors opined that "when [D.B.] experiences stressors or intense emotions, or is within an unstructured or uncontained environment, he may demonstrate impaired executive functioning in the areas of planning, inhibition of impulses, and cognitive flexibility."[50] Test results showed that while D.B. "may often be moody, impulsive, unpredictable, and struggle with substance use" and "results indicated significant depression," D.B.'s "responses . . . were not suggestive of a psychotic process."[51] After stating that D.B.'s parents agreed to follow UNI's recommendations and "not allow a premature discharge," the report recommended "a direct transition . . . to a residential treatment program or a wilderness therapy program."[52]

A November 16 report showed "high anxiety, poor participation in groups . . . still talking about [Absent Without Leave], bullying a peer on the unit, difficulty sleeping, mood sad and

---

[44] AR 316–17.
[45] D.B.'s parents sent him a letter "stating clearly that he will not go home and will go[] to an [RTC] or wilderness home." AR 316.
[46] *Id.*
[47] *Id.*
[48] AR 593.
[49] AR 594.
[50] AR 595.
[51] AR 596.
[52] AR 598.

irritable, eye contact intense, anger issues[,] talks about hitting staff w[ith] rocks, starts to get angry w[ith] peers and needs redirection."[53] Yet a case consultation between UBH and UNI revealed that D.B. "has not been aggressive . . . . [D.B.] does not appear to be at imminent risk of harm to self or others. No solid discharge plan. Recommend peer review" as to the medical network.[54] D.B.'s parents told him that he would "go[] to an [RTC] or wilderness home."[55] As UBH remarked, D.B. "appear[ed] to have gained maximum benefit at the existing level of care and no longer appears to meet . . . guidelines."[56]

An independent, board-certified psychiatrist reviewed D.B.'s file.[57] The physician concluded that the continued stay criteria were not met because D.B.

> does not meet medical necessity criteria for acute inpatient mental health treatment . . . . [D.B.] is not imminently dangerous to self or others. Although he continues to be agitated and make aggressive statements, he has not exhibited acute behavioral dyscontrol . . . . The attending provider's primary rationale for continued inpatient treatment is medication adjustment and to complete physical workup for possible traumatic brain injury. However, these can be pursued on an outpatient basis . . . . [D.B.] entered the program due to his behavioral problems and aggression. Since entering the program, these symptoms have improved. Although [D.B.] continues to be depressed and struggle with irritability, these symptoms do not require 24-hour care. His medication management can continue safely at a lower level of care. His family is supportive of his treatment.[58]

*Denial of Coverage*

UBH informed Plaintiffs that it would not cover inpatient treatment as of November 17, 2017.[59] UBH stated that "an external . . . board-certified psychiatrist . . . reviewed the available documentation and all available information received to date, and . . . determined that coverage

---

[53] AR 335.
[54] *Id.*
[55] *Id.*
[56] AR 337.
[57] Def. MSJ 12; AR 347–48.
[58] AR 348.
[59] AR 518.

is not available."[60] UBH noted that D.B. "was admitted for treatment of his depression" but he "ha[d] made progress."[61] "[D.B.]'s condition no longer me[t] Guidelines for further coverage of treatment in this setting" because he "[wa]s no longer acutely suicidal . . . [,] not homicidal or aggressive . . . [,] not on medications that require 24[-]hour monitoring . . . [,] not psychotic," and the "remaining symptoms can be addressed in a less restrictive setting" like a partial hospital setting.[62] Last, the letter stated that the "determination does not mean that [D.B.] does not require additional health care, or that [he] needs to be discharged."[63]

*Discharge*

D.B. remained at UNI until December 4, 2017 when he was transferred directly to Elevations RTC.[64] The discharge report said that "given the persistence of [barriers to treatment] issues and minimal progress in therapy, it was recommended that [D.B.] be placed in a longer-term [RTC]. [He] was initially very frustrated by this, but by the end of his stay he was able to concede to the plan."[65] UNI noted that D.B.'s assessment was complete, his medications were stable, and he had improved enough to transition to a less-restrictive facility.[66]

---

[60] *Id.*

[61] *Id.*

[62] *Id.*; *see* AR 196 (A partial hospital program is a "structured program that maintains hours of service for at least 20 hours per week during which assessment and diagnostic services, and active behavioral health treatment are provided to members who are experiencing serious signs and symptoms that result in significant personal distress and/or significant psychosocial and environmental issues . . . . The purpose of services is to stabilize and reduce acute signs and symptoms, increase functioning, and assist a member with integrating into community life.").

[63] AR 519.

[64] AR 1716.

[65] AR 693.

[66] *Id.*

**Appeals for Denial of Coverage at Utah Neuropsychiatric Institute**

*Initial Inquiry*

On November 21, Daniel B. called UBH to ask why coverage was denied.[67] He said that he would "absolutely not entertain the idea of [partial hospitalization]" but neither "w[ould he] allow [his son] to come home" because D.B. "must be in a [residential] setting."[68] Further, Daniel B. said that "he absolutely cannot take [D.B.] out of current placement until he has another placement."[69] Daniel B. later appealed.[70]

*First Appeal*

For the first appeal, UBH contracted a board-certified psychiatrist to review D.B.'s case.[71] The reviewer noted that D.B. has a

> diagnosis of Unspecified Depression and presented with suicidal ideation without specific intent plan or means. He has a prior history of a suicide attempt in the past. He was not homicidal and not psychotic at the time of admission, though [he] does have a history of physical aggression towards staff at a wilderness facility that he was in treatment at. He has no acute medical conditions and no illicit drug use . . . . As of the last authorized day, [D.B.] denied suicide thoughts, homicide thoughts and all psychotic symptoms. There has been no self-injurious behavior and no agitation or aggression requiring [medical staff]. He has been medication compliant. He does report ongoing anxiety. He is eating, sleeping and caring for his basic needs.[72]

Thus, the reviewer found that "[r]ecovery c[ould] continue at a lower level of care."[73]

UBH sent D.B.'s case to an associate medical director for further review.[74] The director took "into consideration the available information, along with the additional clinical information given by the doctor during the Urgent Appeal, as well as the locally available clinical services"

---

[67] AR 355.
[68] *Id.*
[69] *Id.*
[70] AR 356.
[71] AR 506–07.
[72] AR 360.
[73] *Id.*
[74] AR 360–61.

and found that continued inpatient treatment at UNI did not meet level of care guidelines.[75] In a November 23 letter, the director told Plaintiffs that

> [b]ased on the . . . Level of Care Guideline for the Mental Health Inpatient Level of Care and Common Criteria . . . it is my determination that no authorization can be provided from 11/17/17 forward. [D.B.] is doing better. The crisis that led to his admission has improved. He can keep himself safe. He is in better behavioral control. He is taking his meds. He does his daily activities. He cooperates in his care. His care could continue in the [mental health partial hospital program] setting.[76]

*Second Appeal*

UNI appealed on January 19, 2018.[77] For the second appeal, UBH referred D.B.'s case to a UBH associate medical director and licensed psychiatrist.[78] The reviewer noted that UNI found D.B. to be "'inconsistently compliant' throughout his stay and showed limited insight and engagement for treatment[,]" and while in treatment, D.B. "attended groups, had individual and family therapy . . . [and] s[t]ruggled with boundaries with peers, especially females."[79] Also, the reviewer found that the "discharge plan was to go to an RTC" and D.B.'s "parents came to Utah to tour RTC programs and they identified Elevations where he would be discharged on 12/04."[80] Finally, the reviewer remarked that "[i]t was not clear why [D.B.] could not discharge earlier as there was no [suicidal/homicidal ideations] . . . ever documented but there were the on-going behavioral issues to be monitored, along with med management."[81]

The reviewer informed Plaintiffs that he had examined D.B.'s case notes and medical record, the guidelines, and appeal letter.[82] He found that coverage was not available after

---

[75] AR 361.
[76] *Id.*
[77] AR 509.
[78] AR 510.
[79] AR 511.
[80] *Id.*
[81] *Id.*
[82] AR 535.

November 17 because D.B. had "made progress and . . . his condition no longer met Guidelines

for further coverage of treatment in this setting."[83] The reviewer concluded that he was

> cooperative overall, ultimately responsive to staff, medication adherent, and the
> acute admission concerns had improved. He presented no serious, acute behavioral
> management challenges. He had no suicidal or self-harm thinking; no self-harmful
> behaviors were reported. He posed no serious risk of harm to others—he was not
> homicidal, physically aggressive, combative or assaultive. There were no bizarre
> beliefs and he was not hallucinating, His mood remained prone to sadness, anxiety,
> irritability and anger. Still, some modest improvement had occurred in that this was
> less intensive. No serious mood disturbance was present. Self-care was adequate.
> There were no medical conditions requiring inpatient care. Medication was helpful.
> [D.B.'s father] was supportive and involved. Care could have continued in a less
> restrictive setting. [D.B.] could have continued care in the Mental Health
> Residential Treatment Center setting.[84]

*Third Appeal*

D.B.'s mother, Kimberly B.,[85] appealed UBH's determination on May 14, 2018.[86]

Though UBH found that Plaintiffs had exhausted their two authorized appeals, UBH considered

the "additional second level of appeal" "as a courtesy."[87] Kimberly B. contended that D.B.'s

treatment at UNI after November 16 was medically necessary.[88] After recounting D.B.'s medical

history, Kimberly B. described that while D.B. "showed much progress while he was in

treatment . . . he was not ready to discharge, and certainly should not have discharged to a partial

hospitalization program."[89] Further, she argued that D.B. "was struggling with his mental illness

throughout the rest of his stay at UNI" and "the extended treatment . . . at UNI helped him learn[]

the necessary skills to move on towards successful aftercare."[90] She stated that UBH had not

provided specific evidence supporting the denial of coverage.

---

[83] *Id.*
[84] AR 536.
[85] To protect D.B.'s mother's privacy, the court uses her first name and last initial only.
[86] AR 544.
[87] Def. MSJ 17; AR 515.
[88] AR 545.
[89] AR 553.
[90] *Id.*

In September 2018, a third UBH associate medical director reviewed the appeal letter and D.B.'s records.[91] Writing to Plaintiffs, the reviewer said that coverage after November 16 was not available based on the level of care guidelines for mental health inpatient care.[92] D.B. "was admitted for treatment of problems with his mood and behavior" but "he had made progress and . . . his condition no longer met Guidelines for further coverage of treatment in this setting."[93] He "was not thinking about hurting himself or others . . . . He was tolerating his medicine. He was able to take care of his needs. He was stable . . . . He did not require 24-hour nursing care and daily physician visits. [D.B.] could have continued care in the Mental Health Residential Treatment Center setting."[94]

**Elevations Residential Treatment Center**

*Admission*

On December 4, 2017, D.B. was admitted to Elevations RTC "for poor impulse control, chronic substance misuse, threats of self[-]harm by overdosing on drugs, a history of violence when using drugs, running away, stealing money, being deceptive, [and] low self[-]esteem with depression."[95] The initial psychiatric evaluation stated that D.B. fit the profile for Major Depressive Disorder, moderate; Cannabis Misuse Disorder, severe; Alcohol Use Disorder, mild; Sedative, Hypnotic or Anxiolytic Use Disorder, moderate; and ADHD, moderate.[96] Though D.B. admitted to overdosing on drugs, he said it was only to get high and not to commit suicide.[97] Elevations concluded that D.B. "need[ed] to be in a long term treatment facility to remain clean,

---

[91] AR 514.
[92] AR 726.
[93] *Id.*
[94] *Id.*
[95] AR 1015.
[96] AR 1719.
[97] *Id.*

sober and safe while he resumes doing school work and learning the underlying causes for his dangerous behavior."[98]

*Initial Coverage*

UBH covered treatment at Elevations from December 4, 2017 to January 4, 2018.[99] UBH approved coverage through January 4 in part because D.B. "was admitted after an accidental overdose[,] . . . stated that he didn't want to live[,] . . . and "has been dealing with depression & anxiety" with a "main stressor . . . identified as his substance abuse."[100]

*Care from December 4 to January 4*

Shift notes from December 4 to 11 reported that D.B. was well and in a good mood, followed expectations, and was managing himself well.[101] Speaking to a therapist on December 8, D.B. said that he "currently feels motivated to do well and get out as soon as he can."[102] The December 10 weekly summary stated that D.B. "communicated to staff that he has no plan to run, that he is ready to work on his issues."[103] At therapy on December 11, D.B. "talked about feeling hopeless" due to a lack of control.[104] But he also made several goals: earning a 3.5 grade point average, gaining parental trust, never using drugs, and controlling his emotions.[105]

D.B. showed respect and encouragement to peers during therapy on December 12 and 13.[106] After a phone call with his mother on December 14, D.B. said that "he plans on doing everything in his power to stay on task and complete his treatment" at Elevations.[107] Staff noted

---

[98] AR 1719–20.
[99] AR 806, 829.
[100] AR 375.
[101] *See* AR 1690, 1693, 1695–96, 1697, 1707–08, 1710–11, 1712, 1714.
[102] AR 1701.
[103] AR 1691.
[104] AR 1687.
[105] *Id.*
[106] AR 1678, 1680.
[107] AR 1675.

from December 15 to 17 that D.B. followed programming and was generally doing well but was acting out to fit in with peers.[108]

The December 17 weekly milieu summary described that "[D.B.] seems to be adjusting well. He has been participating in groups, giving really good feedback to his peers. Staff can see that he has leadership qualities. He doesn't appear to be cueing his peers that much in the moment, he might be hesitant because he is new."[109] On December 18, a shift note said that D.B. seemed to sometimes antagonize his peers and "seems to be falling into negativity behaviors" at times.[110] The next day, D.B.'s therapist said that D.B. was "relatively honest about his past."[111]

UBH assessed D.B.'s status on December 21.[112] The report indicated that D.B. was admitted after an accidental overdose and "has been dealing with depression & anxiety. The main stressor is identified as his substance abuse."[113] UNI's mental status examination reflected: "mood depr[e]ssed, affect congruent, hopelessness, focusing on external motivations and gratification, wants to commit to sobriety."[114] It also noted that a relapse prevention plan was in progress.[115]

D.B.'s therapy notes from December 22 revealed that D.B. was "happy the majority of the time and motivated for treatment."[116] On Christmas, D.B. said to staff that he "was eager to stay on task and complete the treatment program here at [E]levations, so he can go home and finish off the school year."[117] The weekly milieu summary for December 25 said that D.B.

---

[108] AR 1665, 1669, 1670.
[109] AR 1654.
[110] AR 1662.
[111] AR 1660.
[112] AR 370.
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] AR 1649.
[117] AR 1639.

"seems to be fitting in well with his team" and was excited for the leave of absence with his family."[118] But the summary also stated that D.B. "has shown some entitlement with doing things with out [sic] asking first."[119] The day after Christmas, D.B. reported to his doctor no "safety related concerns" and D.B. appeared "relatively engaged and . . . euthymic."[120] A December 27 therapy note described D.B. as honest.[121] In a therapy session, the clinical social worker reported that D.B. "expresses a clear desire to show he is ready to manage [him]self."[122]

UBH conducted another assessment on December 29. It found that D.B. was "affect congruent, alert and oriented, no [suicidal ideation], no [homicidal ideation], no psychosis," his "mood has been stabilizing," and a relapse prevention plan was in process.[123] From December 30 to January 1, 2018, staff noted that D.B. was doing well and followed cues.[124] However, D.B. said on January 2 that he had struggled during his recent leave of absence with a desire to use drugs.[125] Also on January 2, a note described D.B. as "a natural leader, peers respect him, lead[s] by example for the most part."[126] Another note on January 3 reported that D.B. struggled with "staying in class and following staff cues."[127] The note said that D.B. remarked "that he was struggling with his depression" but "seemed to [be] open to suggestions for coping skills."[128] The same day, a therapist related that D.B. "appeared to minimize the events [that occurred over the leave of absence] and acted like what he had shared was 'good enough.'"[129] The therapist also

---

[118] AR 1634.
[119] Id.
[120] AR 1637.
[121] AR 1633.
[122] AR 1616.
[123] AR 375.
[124] See AR 1599–1604.
[125] AR 1593, 1596.
[126] AR 1598.
[127] AR 1750.
[128] Id.
[129] AR 1751.

noted D.B.'s mental status as: "anxious and withdrawn," "guarded," "short attention span," with no "thoughts of hurting others" or "hurting self."[130] One January 4 note stated that D.B. "appeared to struggle with inappropriate behavior" and wondered if D.B. "really started being a follower or maybe true colors are starting to show?"[131]

*Denial of Coverage*

On January 3, UBH sent D.B.'s case to an associate medical director and licensed psychiatrist.[132] The reviewer notified D.B.'s parents that she had first studied the level of care guidelines for RTC level of care and the "available documentation and all information received to date."[133] The reviewer found that D.B. had been admitted to Elevations to treat an unstable mood but D.B. had "made progress and . . . [his] condition no longer [met] Guidelines for further coverage of treatment."[134] As such, D.B. "could continue care in the Mental Health or Dual Partial Hospital Program setting."[135] The reviewer said that the "determination does not mean that [he] does not require additional health care, or that [he] needs to be discharged."[136]

*Care After January 4*

A psychiatric note from January 5 stated that D.B. "has been exhibiting a lot of regressive behaviors overall," "attempting to manipulate and split staff in many areas," and "currently exhibiting many of the behaviors that got him into residential treatment to begin with."[137] Also on January 5, a shift note described D.B.'s actions: "[b]eing aggressive to nursing, using I-Pod when he doesn't have priv[ilege][, and] inappropriate behavior."[138] D.B. "told staff they were

---

[130] *Id.*
[131] AR 1752.
[132] AR 806–07.
[133] AR 806.
[134] *Id.*
[135] *Id.*
[136] AR 807.
[137] AR 1587.
[138] AR 1753.

wrong and the only one[s] who thinks his behaviors have changed."[139] "A concern was brought

up that he possib[ly] was cheeking his medication."[140]

On January 7, a shift note described how D.B.

> appears to be struggling with depression and being snappy and disrespectful towards staff and peers. He does not seem to show that he will be working to change at any point any time soon. He seems to struggle with following staff directives and at a point where he is yelling things to staff like "F*** you" when escalated. He was given an intervention for this and did not appear to stay at his desk and follow expectations without looking out of his doorways and trying to talk to peers as they walked by. He seemed to struggle greatly with this and did [not] show any means of slowing down this behavior.[141]

In a January 8 milieu progress note, a case manager noted that D.B. "has been really struggling"

since returning from a home visit; "[i]t seems that the honeymoon period is now over and the

real [D.B.] is starting to show."[142] On January 9, D.B.'s physician recorded that he was

antagonistic and "consistently negative . . . with verbal aggression and cursing," exhibited "all

the behaviors . . . which led to his placement in residential treatment," and had additional suicidal

thoughts.[143] The physician said that if D.B. was not in a "24/7 acuity environment, he would

nearly immediately regress with substance use and likely suicidal ideation."[144]

A February 4 weekly summary stated that D.B. "has been really struggling . . . talking

about running, how bad he hates it here" and shared that he tried to run from the facility.[145] In a

therapy session on February 5, D.B. "shared that he felt hopeless and planned to run to the

nearest gas station and take a bunch of meds and kill himself" and further stated that "he didn't

care he was just going to sit here until he is 18 and run at the first attempt that he gets."[146]

---

[139] *Id.*
[140] *Id.* In other words, D.B. may have been pretending to swallow medication.
[141] AR 1755.
[142] AR 1756.
[143] AR 1758.
[144] *Id.*
[145] AR 1768.
[146] AR 1770.

In a February 11 summary, staff reported that D.B. "has been very defiant, disrespectful and just doesn't seem to care about anything."[147] When a therapist told him that he would have to wear an ankle monitor, he "was not happy."[148] D.B.'s parents told him that "if he wore the ankle monitor, did his school work and didn't act[] like a jerk[,] . . . he could go home in May for football."[149] A week later, he had "been doing his school work like crazy."[150] On February 20, a physician noted that D.B. "continues to struggle behaviorally but is being reintegrated into programming" and "remains hyper-focused on school work."[151] He was purportedly "manipulating his environment to gain time . . . under the guise of attempting to complete his education and return home without facing other therapeutic issues."[152]

On March 7, D.B.'s therapist reported that he was "making open statements about 'not seeing any value in life' or 'I will kill myself if I have to go to jail.'"[153] On March 9, the attending physician noted that "[g]iven [D.B.'s] reported suicidal thoughts and the likelihood of potential problems at home, it is the clear recommendation that any home visit would be against medical advice."[154] The physician recounted D.B.'s statement that "he would sit here, doing nothing until 18 and then likely hurt himself and use drugs."[155] As a result of the statements and other negative actions, Elevations restricted D.B. to his room until March 12.[156]

From March 22 to April 2, D.B. went home on a leave of absence and had "a couple of mess ups."[157] At the airport, he took "a bunch of Mucinex . . . so when he got home he was all

---

[147] AR 1772.
[148] AR 1773.
[149] Id.
[150] AR 1774–75.
[151] AR 1776
[152] Id.
[153] AR 1780.
[154] AR 1779.
[155] Id.
[156] AR 1781–82, 1784.
[157] AR 1787.

messed up."[158] D.B. also drank alcohol when he was left alone in a hotel room.[159] However, he said that he did not use drugs on the home visit "even though there were people around him using drugs."[160] Finally, during a parent seminar on April 27, D.B. said to his mother that "if he is going to be a drug addict there i[s] 'nothing you can do about it'" and that treatment had not "helped him because he didn't want it to help him."[161]

### Discharge

Elevations discharged D.B. on May 4, 2018, stating that he "had completed the credits for his Junior year . . . . He had been resistant to therapy after the first month and threatened to shut down if he was kept at Elevations past completing his . . . credits, and the focus was on trying to capture . . . motivation [D.B.] had at this time."[162] In addition to the admitting diagnoses,[163] Elevations found that D.B. had antisocial personality traits.[164] Elevations recommended continual monitoring of medications, a community support group, and attendance at a partial hospital program with transition to weekly therapy.[165]

**Appeals for Denial of Coverage at Elevations RTC**

### First Appeal

On July 5, 2018, Kimberly B. appealed UBH's denial of coverage.[166] She highlighted that UBH had authorized treatment from December 4, 2017 to January 4, 2018, but did not explain sufficiently why D.B. "was suddenly no longer in need of residential treatment" as of January

---

[158] *Id.*
[159] *Id.*
[160] *Id.*
[161] AR 1790.
[162] AR 1020.
[163] *See* AR 1719.
[164] AR 1021.
[165] AR 1020. The nursing discharge also stated that D.B. left Elevations because he finished his junior year of credits and he showed "continued resistance to accepting help at Elevations." AR 1050.
[166] AR 821.

4.[167] In short, Kimberly B. argued that "substantial evidence prov[ed] that . . . residential treatment at Elevations was medically necessary" after January 4.[168]

UBH sent the appeal to a doctor certified in psychiatry and neurology.[169] The reviewer stated that after reading facility medical records, the appeal, case notes, and care guidelines, coverage after January 4, 2018 was not authorized.[170] The reviewer explained that D.B. was "admitted for treatment of an unstable mood" but since D.B. "ha[d] made progress . . . [his] condition no longer meets Guidelines for further coverage of treatment in this setting."[171] "[He] could continue care in the Mental Health or Dual Partial Hospital Program setting."[172]

### Second Appeal

Kimberly B. initiated another appeal on October 23.[173] She argued that UBH had not utilized updated level of care guidelines, the reviewers had not considered D.B.'s substance abuse diagnosis, UBH had failed to explain what changed in D.B.'s condition to make reviewers think he was ready for an outpatient program; and the statement that D.B. had made "some progress" was not an adequate explanation for supporting discharge to a lower level of care.[174] UBH sent the appeal to a physician board-certified in adult and child psychiatry.[175]

The reviewer said in a February 6, 2019 letter that he had "fully investigat[ed] the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode," medical records, case records, and Mental Health RTC level of care guidelines.[176] The

---

[167] AR 829.
[168] AR 821–22.
[169] AR 1801.
[170] Id.
[171] AR 1802.
[172] Id.
[173] AR 1825.
[174] See AR 1827–30.
[175] AR 1821–22.
[176] AR 1810.

reviewer found that D.B. had been admitted to Elevations "primarily for his mood and behavior."[177] Yet "[a]fter reviewing the available information," the reviewer noted that he "had made sufficient progress [so] that his condition no longer met Guidelines for further coverage of treatment in this setting."[178] The reviewer explained that D.B.'s

> mood remained prone to some sadness and anxiety, though modest improvement had occurred in that this was less intensive. He was overall psychiatrically stable, with no report of self[-]harm, aggression, change in mental status or serious mood, cognitive or behavioral disturbance prohibiting him from participating in treatment in a less restrictive setting. He was able to understand and participate in programming. Sleeping, eating, and self[-]care were adequate. He had no co-occurring medical or substance abuse complications that would need more 24-hour care. He needed further substance abuse treatment. He had family sessions and therapeutic outings. Continued Mental Health RTC structure and frequency was not medically necessary at that point for his mental health treatment and recovery. Continued improvement in his baseline symptoms, medication management, and continued individual and family work could have been provided in the dual partial hospitalization setting.[179]

UBH notified Plaintiffs on February 6, 2019 that they had exhausted all pre-litigation appeal obligations.[180] Plaintiffs filed their Complaint on August 31, 2020.[181] The parties filed cross motions for summary judgment on December 10, 2021.[182] The matter is fully briefed.[183]

## LEGAL STANDARD

### I. Summary Judgment Standard

"Where, as here, the parties in an ERISA case both moved for summary judgment . . . , summary judgment is merely a vehicle for deciding the case; the factual determination of

---

[177] *Id.*
[178] *Id.*
[179] AR 1810–11.
[180] AR 1811.
[181] ECF No. 2.
[182] Def. MSJ; Pl. MSJ.
[183] ECF Nos. 60, 61, 74, 75.

eligibility for benefits is decided solely on the administrative record, and the nonmoving party is not entitled to the usual inferences in its favor."[184]

## II. Review of Benefits Decisions

The court must first identify the proper standard to review UBH's decisions. The Supreme Court has observed that "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue."[185] Applying the law of trusts, the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[186] "[I]f the plan gives the administrator discretionary authority, '[the court] employ[s] a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'"[187]

The parties do not dispute that the Plan affords the administrator broad authority to interpret the Plan and make benefits decisions.[188] Accordingly, the arbitrary and capricious standard is the presumptive standard of review. Plaintiffs, however, argue that a de novo standard should apply. They contend that despite UBH's discretion over mental health claims, UBH's failure to adhere to minimum statutorily required claim review and appeal processes negates deference to the Plan administrator.[189] According to Plaintiffs, "claims administrators are required to 'strictly adhere' to the regulations requirements or else 'a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to

---

[184] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up).
[185] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).
[186] *Id.*
[187] *Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 675 (10th Cir. 2019) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).
[188] *See* Def. MSJ 2, 5–6; Pl. Opp'n to Def. Mot. for Summ. J. ("Pl. Opp'n") 2–3, ECF No. 61, filed Mar. 8, 2022.
[189] *See Ian C. v. United Healthcare Ins. Co.*, No. 2:19-cv-474, 2022 WL 3279860, at *4–5 (D. Utah Aug. 11, 2022).

pursue any available remedies' on the basis that, 'the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.'"[190]

Defendants argue that this is not Tenth Circuit precedent.[191] In the Tenth Circuit, de novo review is proper despite a plan's conferral of discretion on an administrator if: the administrator fails to exercise discretion within the required timeframe;[192] the administrator fails to apply its expertise to a particular decision;[193] the case involves "serious procedural irregularities";[194] the case involves "procedural irregularities in the administrative review process";[195] or where the plan members lack notice of the conferral of administrator discretion over the plan.[196] However, certain exceptions return the standard to deferential review.[197] One relevant exception is substantial compliance: "in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to de novo review."[198] In other words, courts do not "apply 'a hair-trigger rule' requiring de novo review whenever the plan

---

[190] Pl. Opp'n 14–17 (quoting 29 C.F.R. § 2590.715-2719)).

[191] *See* Def. MSJ 29–30 (citing *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168 (10th Cir. 2004)).

[192] *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631–32 (10th Cir. 2003).

[193] *Id.* at 632.

[194] *Martinez v. Plumbers & Pipefitters Nat. Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[195] *LaAsmar*, 605 F.3d 789 at 797; *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 588 (10th Cir. 2019) (unpublished).

[196] *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1065 (10th Cir. 2020).

[197] *See, e.g.*, *Finley*, 379 F.3d at 1174 (explaining that Finley's administrative appeal falls into the "McGarrah exception," where deferential review applies "if a claimant fails to provide meaningful new evidence or raise significant new issues on administrative appeal, and the delay does not undermine the court's confidence in the integrity of the administrator's decision-making process" (cleaned up) (quoting *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000))).

[198] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1317 (10th Cir. 2009) (citing *Gilbertson*, 328 F.3d at 634); *see also Finley*, 379 F.3d at 1174 (A "plan administrator is in substantial compliance with this deadline if the delay is: (1) 'inconsequential'; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant. (quoting *Gilbertson*, 328 F.3d at 635)).

administrator, vested with discretion, failed *in any respect* to comply with the procedures mandated by this regulation."[199]

Here, the result is the same under both standards. As to denial of coverage for UNI, even if the court applied a de novo standard, it would still find that UBH's decision was supported by a preponderance of the evidence.[200] And under a deferential standard the court would find that UBH's decision to deny coverage at Elevations was insufficiently supported by the record.

## DISCUSSION

At issue is UBH's denial of benefits for treatment at UNI after November 16, 2017, and treatment at Elevations RTC after January 4, 2018. The court reviews each decision in order.

### I.  UBH's Denial of Coverage for Care at UNI After November 16, 2017

Defendants argue that UBH's refusal to cover D.B.'s treatment at UNI after November 16, 2017 was proper because substantial evidence supported UBH's decision. Plaintiffs argue otherwise. For the reasons below, the court finds that UBH's coverage decision was proper under both the arbitrary and capricious standard and under the de novo review standard.[201]

#### A.  The Record Supported UBH's Decision to Deny Continued Coverage for Inpatient Treatment at UNI.

UBH's decision to deny coverage after November 16, 2017 was supported by the record. To qualify for inpatient treatment under the Plan, there had to be an "imminent or current risk of harm to self, others, and/or property which cannot be safely, efficiently, and effectively managed

---

[199] *LaAsmar*, 605 F.3d at 799; *see Peter E. v. United Healthcare Servs., Inc.*, No. 2:17-cv-435 2021 WL 5962259, at *7 (D. Utah Dec. 16, 2021); *Bruce M. v. Aetna Life Ins. Co.*, No. 2:20-cv-00346, 2021 WL 5522554, at *6–8 (D. Utah Nov. 24, 2021).

[200] *See Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 833 (10th Cir. 2008) (unpublished).

[201] *Id.*; *see David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1123 (D. Utah 2021) (The "*de novo* standard is not whether substantial evidence or some evidence supported the administrator's decision . . . . [I]t is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." (cleaned up)).

in a less intensive level of care."[202] Examples of such factors include a "life-threatening suicide attempt; self-mutilation, injury, or violence towards others or property; [th]reat of serious harm to self or others; [or c]ommand hallucinations directing harm to self or others."[203]

UBH initially approved inpatient treatment at UNI in part for D.B.'s "[i]nability to maintain safety in less restrictive setting[,] [s]uicidal ideation and aggression/harm to others[,] and [s]ubstance use."[204] Indeed, UNI indicated on the admitting evaluation that D.B. presented a "[r]isk of early relapse with premature discharge from the inpatient setting and risk of violence."[205] But after UNI completed neurological testing and D.B. had been under observation for over three weeks,[206] UBH denied coverage for reasons clearly stated in the denial letters.[207]

The first reviewer remarked that as of November 16, D.B. was "no longer acutely suicidal," not aggressive, "not psychotic," nor was he on "medications that require 24[-]hour monitoring."[208] In the second letter, the reviewer noted that D.B. denied suicidal thoughts, homicidal thoughts, showed no psychotic symptoms, no "self-injurious behavior or agitation requiring [medical attention]," no "acute medical conditions . . . [,] illicit drug use[,] or withdrawal."[209] The reviewer also found that D.B. was "eating, sleeping and caring for basic needs" and medication compliant.[210] The third reviewer echoed the previous comments, adding that D.B. "posed no serious risk of harm to others" and that there were "no bizarre beliefs and

---

[202] AR 200.
[203] *Id.*
[204] AR 575.
[205] AR 582.
[206] *See* AR 593–98.
[207] In the denial letters, reviewers stated that they looked at "available documentation and all information received to date," "additional clinical information given by the doctor during the Urgent Appeal," case notes, medical record, and letters of appeal. AR 361, 518, 535, 726.
[208] AR 518.
[209] AR 361.
[210] *Id.*

[D.B.] was not hallucinating."[211] While he "remained prone to sadness, anxiety, irritability and anger," no "serious mood disturbance was present" and his medication was working.[212] The last reviewer stated that D.B. was "not thinking about hurting himself or others" and was "stable from a medical standpoint."[213] Additionally, two reviewers indicated that D.B. could have continued care in a RTC setting.[214]

UNI's observations were consistent with the reviewers' comments. D.B.'s admitting history and physical report offered a diagnosis for aggressive behavior and identified no acute medical issues.[215] The record does not mention any violent episodes after November 6.[216] UNI did report some anger issues and threatening language.[217] But by November 16, UNI noted that D.B. "has not been aggressive" and there was no active suicidal or homicidal ideations or "imminent risk of harm to self or others."[218] While UNI did not want a "premature discharge,"[219] the record shows that an education consultant started looking for viable RTCs from at least November 6.[220] As UBH reported on November 16, D.B. "appear[ed] to have gained maximum benefit at the existing level of care and no longer appears to meet [medical network] guidelines."[221] UNI noted in the discharge summary that D.B. experienced "minimal progress in therapy" and that is why "it was recommended that [D.B.] be placed in a longer-term" RTC.[222] And while the discharge report states that as of December 4, D.B.'s "assessment is complete,"

---

[211] AR 536.
[212] *Id.*
[213] AR 726.
[214] AR 536, 726.
[215] AR 586.
[216] *See* AR 316.
[217] *See* AR 335.
[218] *Id.* Granted, the record shows D.B. having anxiety, trouble sleeping, bullying a peer, irritable and sad mood, making angry statements, and telling Kimberly B. that "he would rather kill himself than go to a boarding school." AR 336. But there are no documented incidents that suggested to UNI imminent or current risk of harm. *Id.*
[219] *Id.* According to the admission report, UNI expected D.B. to stay in the program for four to six weeks. AR 582.
[220] *See* AR 293.
[221] AR 335, 337.
[222] AR 693.

waiting on diagnoses is not a criterion for continued care at an inpatient facility under this Plan.[223]

Under the terms of the Plan, inpatient care requires an imminent or current risk of harm that cannot be managed in a less intensive setting.[224] As noted above, the record clearly supported UBH's decision.

### B.  Plaintiffs' Arguments in Response Are Unpersuasive.

Plaintiffs make several arguments as to why UBH's decision to deny coverage at UNI after November 16, 2017 was wrong.

#### 1.   Failure to Address Substance Abuse

Plaintiffs argue that UBH ignored D.B.'s substance abuse in its denial letters. UBH based the denial for additional coverage only on the failure to meet mental health treatment guidelines instead of guidelines addressing substance abuse.[225] Additionally, Plaintiffs contend that D.B. continued to receive necessary substance abuse treatment after November 16.[226]

The UNI denial letters state various reasons for D.B.'s admission. They describe that D.B. was admitted for "treatment of his depression,"[227] a "crisis,"[228] "treatment of mood, behavioral, self-harm, and aggression concerns,"[229] or "problems with his mood and behavior."[230] D.B. was transferred to UNI after he assaulted a staff member at a wilderness program.[231] While UNI recognized his substance abuse, it seemed chiefly concerned for his

---

[223] *Id.*; *see* AR 200.
[224] *See* AR 200.
[225] *See* Pl. MSJ 22–23.
[226] *See id.* at 23–24.
[227] AR 518.
[228] AR 361.
[229] AR 535.
[230] AR 726.
[231] AR 575.

safety and that of others.[232] So, too, the reviewers. By grounding their review on the mental health level of care guidelines for inpatient treatment, the reviewers reasonably focused on whether there was an "imminent or current risk of harm to [D.B.], others, and/or property which cannot be" managed in a lower level of care.[233]

The letters also stated that reviewers considered all available information, including medical records and case notes that discussed D.B.'s drug use.[234] The letters noted that he was not on medications that needed 24-hour monitoring, he had no acute medical conditions, and no illicit drug use or withdrawal.[235] The third letter remarked that D.B.'s acute admissions concerns (which included substance use) had improved.[236] Even if the court accepts Plaintiffs' premise that UNI provided active treatment for D.B.'s substance abuse after November 16, the inpatient continued service guidelines required that he meet admission criteria.[237] That means there must have been "imminent or current risk of harm to self, others, and/or property."[238] But as the denial letters explained, he was medically stable: there was no imminent risk of harm from drug overdose or otherwise.[239]

As to Plaintiffs' argument that UBH applied the wrong level of care guidelines, their argument fails. Plaintiffs do not explain how UBH's failure to reference substance abuse guidelines showed that UBH's decision was incorrect. While the record contains guidelines for

---

[232] *See id.* ("admitted to CAT program with increasing depression, erratic behavior and aggression *as well as substance use*" (emphasis added)); AR 582 ("Risk of early relapse with premature discharge from the inpatient setting and risk of violence; has been violent to others, expresses or is verbally or physically aggressive to others and history of violence.").
[233] AR 200.
[234] *See* AR 518, 361, 535, 726.
[235] *See* AR 518, 361, 535, 726.
[236] AR 536.
[237] *See* AR 190, 200.
[238] AR 200.
[239] *See* AR 361, 535, 726.

inpatient substance abuse treatment,[240] Plaintiffs do not discuss them or attempt to explain how D.B. met their requirements. As noted previously, D.B. was admitted to UNI for his aggressive behavior and threats of violence. While UNI noted that D.B. had substance abuse issues,[241] Plaintiffs fail to address how the record—as applied to the guidelines—required continued coverage for inpatient substance abuse treatment. The court has reviewed the record, including the inpatient substance abuse guidelines, and it does not find that D.B. required additional inpatient coverage.

### 2.   Failure to Reference the Plan and Medical Records

Plaintiffs also argue that UBH's failure to cite to specific Plan provisions and medical records was arbitrary and capricious.[242] Yet Plaintiffs cite no authority that requires plan administrators or reviewers to give record pincites when denying coverage. Here, UBH used relevant level of care guidelines—mental health inpatient level of care—and referenced them. Reviewers addressed whether D.B. needed 24-hour monitoring, had acute medical conditions or thoughts of self-harm or homicide, and whether he could satisfy his basic needs.[243] As to UNI, UBH sufficiently explained why he was not covered after November 16. For example, the fourth denial letter described that D.B. had problems related to his mood and behavior, but after considering the mental health level of care guidelines for inpatient care, the reviewer found that he had made progress, he was not at risk of hurting himself or others, he was able to care for himself, he was medically stable, and he did not need 24-hour care.[244]

---

[240] *See* AR 204, 219–20.
[241] *See* AR 575 ("as well as substance abuse").
[242] *See* Pl. MSJ 32–33.
[243] *See* AR 200 (guidelines for inpatient level of care); AR 361, 518, 535, 726.
[244] AR 726.

### 3.  Failure to Consider Pre-UNI Medical History

Plaintiffs contend that UBH's decision was arbitrary and capricious because reviewers ignored D.B.'s complete medical history, particularly pre-UNI treatment records that Kimberly B. offered in the third appeal for denied UNI coverage.[245] However, UBH reviewers stated in several denial letters that they had considered Plaintiffs' appeals.[246] As such, Plaintiffs cannot demonstrate that UBH did not consider the attached treatment records. Additionally, plan administrators and reviewers do not have to "accord special weight to the opinions of a claimant's physician," let alone a claimant's past providers who have no knowledge as to the claimant's current medical status.[247]

### 4.  Failure to Defer to Treatment Providers

In a similar vein, Plaintiffs argue that UBH did not properly defer to UNI treatment providers.[248] The record shows otherwise. Multiple professionals reviewed the medical reports, case notes, letters of appeal, level of care guidelines, and all other available information and concluded that D.B. did not need continued inpatient care after November 16.[249] Even UNI had recommended transfer to an RTC.[250] And as of November 16, UNI noted no concerns as to an imminent risk of harm and said that he was medically stable.[251] For these reasons, the record shows that UBH did not "cherry-pick" or "shut [its] eyes" to the evidence.[252]

---

[245] *See* Pl. Opp'n 24–25; AR 606–81.
[246] AR 361, 535, 726.
[247] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833–34 (2003).
[248] *See* Pl. MSJ 28–31.
[249] *See* AR 361, 518, 535, 726.
[250] *See* AR 598.
[251] AR 335.
[252] *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004).

### 5.   Offering Rationales Not Found in Denial Letters

Plaintiffs argue that Defendants raise for the first time in briefing that UBH improperly considered correspondence from Daniel B. as to RTCs.[253] Plaintiffs contend that the decision to deny benefits was arbitrary and capricious "[t]o the degree that these items colored UBH's decision" because UBH had not offered these facts in the denial letters.[254]

The court will only "consider the specific basis upon which the Plan administrator relied in its administrative denial of benefits."[255] But the court may measure the "substantiality of the evidence . . . against the backdrop of the administrative record *as a whole.*"[256] Here, the record reveals that UNI had been investigating RTCs as early as November 6,[257] that D.B.'s parents had been discussing these options with an education consultant by November 13,[258] and that Daniel B. and Kimberly B. told D.B. in a letter received by November 15 that he would go to a RTC.[259] While these are record facts, the court does not consider Defendants' arguments regarding them since the grounds did not appear in the denial letters. As noted above, the record is clear that D.B. did not qualify for additional inpatient treatment under the terms of the Plan after November 16, 2017. What his parents did, said, or requested regarding RTCs does not change the analysis here.

### 6.   Selection of an Arbitrary Date to End Coverage

Plaintiffs further contend that November 16 was arbitrary because UBH ignored the medical necessity of ongoing treatment and "'diagnosing' mental illness, substance use

---

[253] *See* Pl. Opp'n 22; Def. MSJ 34.
[254] Pl. Opp'n 22.
[255] *Spradley v. Owens-Ill. Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1141 (10th Cir. 2012).
[256] *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006) (emphasis added) (citing *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)).
[257] AR 293.
[258] AR 316.
[259] AR 345.

disorders, and their symptoms."[260] In support, Plaintiffs point to the fact that only at discharge did UNI finish its assessment and state that D.B. was stable enough to transition to a lower level of care.[261] However, the record shows that the date was not arbitrary. The level of care guidelines state that a member is eligible for discharge when he "can be safely transitioned to a less intensive level of care."[262] It was reasonable for UBH to hone in on UNI's discussion of a "direct transition from the UNI CAT Program to a residential treatment program" on November 15.[263] Plus, UNI noted on November 16 that D.B. had not been aggressive, there was no active suicidal or homicidal ideations, and D.B. was not at imminent risk of harm to himself or others— indications that D.B. no longer needed 24-hour inpatient treatment and care.[264] As discussed earlier, coverage for inpatient care required an imminent or current risk of harm that cannot be managed in a less intensive setting.[265] The record shows that the imminent or current risk of harm was lacking and that D.B. could be treated in a less intensive setting.

For all of these reasons, the court finds that UBH's denial of coverage at UNI after November 16, 2017 was supported under both standards of review.[266]

## II. UBH's Denial of Coverage for Care at Elevations RTC After January 4, 2018

The parties dispute whether UBH's denial of coverage for Elevations was arbitrary and capricious. Under an arbitrary and capricious standard, review "is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[267] The "decision need not

---

[260] Pl. MSJ 33 (citing AR 135, the Plan's definition of "covered health services").
[261] *Id.*
[262] AR 190.
[263] AR 598.
[264] AR 335.
[265] *See* AR 200.
[266] Plaintiffs do not argue that D.B. met inpatient admission criteria under any alternate basis. *See* AR 200 (factors relating to physical complications, acute changes in the patient's signs and symptoms, or Crisis Stabilization and Assessment or 23-Hour Observation). In any event, having reviewed the record, the court finds no support for continued inpatient treatment after November 16, 2017.
[267] *LaAsmar*, 605 F.3d at 796 (citation and internal quotation marks omitted).

be the only logical one nor even the best one. It need only be sufficiently supported by facts within [the administrator's] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis."[268]

### A. UBH's Denial of Continued Coverage for Residential Treatment Was Arbitrary and Capricious.

Plaintiffs argue that January 4, 2018 was an arbitrary date to end coverage because UBH ignored the medical record, disregarded the recommendations of treatment providers, and failed to adhere to the applicable level of care guidelines respecting D.B.'s substance use and mental health. Plaintiffs also assert that the record showed that D.B. needed further residential care because he continued to face mental health and substance use issues, refused to take medications, and was at risk of harming himself.[269]

Defendants argue that UBH's denial of coverage for D.B.'s inpatient treatment at Elevations after January 4, 2018 was supported by substantial evidence. They contend that reviewers reasonably concluded, based on the guidelines, medical records, and case notes, that care could have continued in a partial hospitalization program setting.[270]

Weighing UBH's denial letters, the first two offer mere conclusory rationales: "it is noted that [D.B.] has made progress and that [his] condition no longer meets Guidelines for further coverage of treatment in this setting."[271] UBH elaborated in the third letter. The "factors leading to [D.B.'s] . . . admission appeared to be able at that point to be safely treated in a less intensive setting."[272] He was reported to be "more cooperat[ive], responsive to staff, and medication

---

[268] Id. (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (cleaned up)).
[269] AR 190 ("factors which led to admission have been addressed to the extent that the member can be safely transitioned to a less intensive level of care").
[270] Id.
[271] AR 806, 1801; see Bruce M., 2021 WL 5522554, at *11 ("short on information and analysis").
[272] AR 1810.

adherent."[273] While his mood was "prone to some sadness and anxiety," "modest improvement had occurred in that this was less intensive."[274] The reviewer noted that D.B. was overall psychiatrically stable, with no reports of self-harm, aggression, changes in mental status, or "cognitive or behavioral disturbance prohibiting him from participating in treatment in a less restrictive setting. He was able to understand and participate in programming. Sleeping, eating, and self[-]care were adequate. He had no co-occurring medical or substance abuse complications that would need more 24-hour care."[275] In sum, Defendants concluded that D.B. was not in imminent or current risk of harm to himself or others and he had shown enough improvement that treatment for his mood and behavior could have been handled at a lower level of care.

Between December 4 and January 4, the record shows some indications that D.B. had progressed.[276] As to his poor impulse control, the record demonstrates that D.B. did not try to escape,[277] he made several concrete goals,[278] he "expresse[d] a clear desire to show he is ready to manage [him]self,"[279] and overall, he followed directions from staff and managed himself well.[280] For chronic substance use, D.B. did not use during this period, even when he went home and had thoughts about using drugs.[281] Further, he expressed a desire to commit to sobriety and Elevations had instituted a successful relapse prevention plan.[282] As to threats of self-harm, there were no reported suicidal or homicidal ideations or psychoses.[283] Elevations reported no thefts

---

[273] *Id.*

[274] *Id.*

[275] AR 1811.

[276] *See* AR 1015 (poor impulse control, chronic substance misuse, threats of self[-]harm by overdosing on drugs, a history of violence when using drugs, running away, stealing money, being deceptive, [and] low self[-]esteem with depression).

[277] *See* AR 1691 (The December 10 weekly milieu summary stated that D.B. "communicated to staff that he has no plan to run, that he is ready to work on his issues.).

[278] *See* AR 1687.

[279] AR 1616.

[280] *See, e.g.*, AR 1690, 1693, 1695–96, 1697, 1707–08, 1710–11, 1712, 1714.

[281] *See* AR 1593, 1596.

[282] AR 370.

[283] AR 375.

during this period. He was honest with his physician about his past bad actions[284] and his desire to use drugs during his leave of absence.[285] On the whole, D.B. did not exhibit low self-esteem with depression.[286]

The record illustrates, however, that D.B. continued to have significant behavioral and mental health issues. Elevations reported that he sometimes fell into negative behaviors, had shown some entitlement, was struggling with paying attention in class, was depressed, and was minimizing his negative actions over his leave of absence.[287] In fact, D.B.'s therapist reported that he had lied about what had happened during his leave of absence.[288] A shift note on January 4 described D.B. as struggling with inappropriate behavior.[289] Elevations noted he had stolen drugs from his father while at home, had stolen food from another student, had "shown that he hasn't had any integrity," and was demanding extra medication.[290] The staff remarked, "[i]t seems that the honeymoon period is now over and the real [D.B.] is starting to show."[291]

Thus, UBH did not adequately explain, how D.B.'s challenges identified at admission could have been treated at a lower level of care.[292] D.B. was admitted to Elevations for "poor impulse control, chronic substance misuse, threats of self[-]harm by overdosing on drugs, a history of violence when using drugs, running away, stealing money, being deceptive, [and] low self[-]esteem with depression."[293] Yet UBH's denial letters stated only that D.B. was admitted

---

[284] AR 1633, 1616, 1660.
[285] AR 1593, 1596.
[286] *See* AR 1639, 1649, 1665, 1669, 1670, 1675, 1678, 1680, 1690, 1693, 1695–96, 1697, 1701, 1707–08, 1710–11, 1712, 1714.
[287] *See* AR 1634, 1662, 1750, 1751.
[288] AR 1751.
[289] AR 1752.
[290] AR 1756.
[291] *Id.*
[292] AR 198.
[293] AR 1015.

for his mood and behavior.[294] The letters did not sufficiently address the full extent to which he was admitted, nor did they explain how the record supported a step down in treatment. Specifically, UBH's claim that he had no "change in mental status" is unsupported given the complete record.[295] Additionally, UBH noted that D.B. "needed further substance abuse treatment."[296] He also stole prescription drugs from his father over the late December leave of absence[297] and lied about it to his therapist.[298]

UBH's choice of January 4, 2018, as the cut-off date for coverage appears arbitrary. *Charles W. v. Regence BlueCross BlueShield of Oregon* is instructive.[299] In *Charles W.*, the court found that the plan administrator's denial of coverage for inpatient treatment after seventy-two days was arbitrary.[300] The record showed that the only significant event on the last day of coverage was a perfunctory report from a psychiatrist noting that the patient experienced some struggle with treatment.[301] In the two weeks before the coverage cancellation, the patient had good days and bad days.[302] And the patient showed the same mix of symptoms in the next two weeks.[303] Going even further, the court found evidence that the patient may not have made any progress at all.[304] Thus, the court concluded that "the most logical explanation for [the plan administrator's] decision [wa]s simple impatience."[305]

---

[294] AR 1810.
[295] AR 1811.
[296] *Id.*
[297] AR 1756.
[298] AR 1751.
[299] No. 2:17-cv-00824, 2019 WL 4736932 (D. Utah Sept. 27, 2019).
[300] *Id.* at *10.
[301] *Id.*
[302] *Id.*
[303] *Id.* at *10–11.
[304] *Id.* at *11.
[305] *Id.*

Regarding D.B.'s treatment at Elevations, UBH likewise seemed impatient. Like the patient in *Charles W.*, D.B. had some good days and some bad days. While D.B. seemed to have more good days than bad days, many of the reports commenting on D.B. were either initial reports,[306] or, like the physician's report in *Charles W.*, perfunctory.[307] There was nothing significant about January 4 other than it being the 30-day mark to D.B.'s start of residential care. The only recorded event on January 4 was a shift log.[308] What's more, UBH had last sought a progress update on December 29, only three and a half weeks after D.B. arrived at Elevations.[309] UBH could have waited and reviewed the therapeutic session and weekly summary following his return from his first leave of absence. By January 8, UBH would have obtained a more complete picture of D.B.'s health to include "exhibiting a lot of regressive behaviors overall,"[310] showing aggression,[311] possibly feigning taking medication,[312] and struggling with depression.[313] One staff member described D.B. as not "show[ing] any means of slowing down this behavior."[314] As a January 9 progress note indicated, he was showing all of the behaviors for which he had been admitted to residential treatment.[315]

Indeed, D.B. continued to regress. The record shows suicidal ideations, attempts to escape, refusals to take medication, aggression, depression, and substance use.[316] He told his therapist that he felt hopeless and wanted to run away and kill himself.[317] As of March 7, he was

---

[306] *See, e.g.*, AR 1661 ("[D.B.] appeared to have a good morning.").
[307] *See, e.g.*, AR 1691 (weekly milieu summary stating the goal was to get D.B. oriented to the program).
[308] AR 1752.
[309] AR 375.
[310] AR 1587.
[311] AR 1753.
[312] *Id.*
[313] AR 1755.
[314] *Id.*
[315] AR 1758.
[316] *See, e.g.*, AR 1758.
[317] AR 1770.

openly expressing suicidal ideations and threatening to kill himself if he had to go to jail, leading to Elevations restricting him to his dorm and delaying a leave of absence.[318] When D.B. did go home after Elevations lifted the restrictions, he took Mucinex to get high and drank alcohol in secret.[319] At discharge, Elevations added a diagnosis of antisocial personality based on "repeated patterns where [D.B.]'s words and/or actions that were deceitful, showed lack of remorse or indifference for how his actions affected others, and failure to conform to expectations."[320] As to his other diagnoses, Elevations summarized that he was resistant to working on controlling his emotions and he "appeared to be uncommitted to making the changes necessary to remain sober."[321] Last, D.B.'s physician noted that he had stolen medicine and exhibited low self-esteem and concluded that his prognosis was "poor to guarded."[322]

Plaintiffs raise several other arguments: that UBH did not adequately cite to the Plan and treatment records, that UBH ignored pre-UNI medical history, and that UBH did not consider D.B.'s substance abuse.[323] The court has already addressed the first two arguments as to UBH's denial of coverage for UNI. The court reiterates that Plaintiffs present no case law that requires reviewers to give record pincites or give special weight to claimants' physicians to satisfy an arbitrary and capricious review. Plaintiffs' third argument is belied by the record. UBH's final denial letter for coverage at Elevations acknowledged D.B.'s substance use. The letter stated that he "needed further substance abuse treatment."[324] The reviewer's point was that he did not require treatment at a 24-hour residential center. However, as discussed above, UBH's mistake was the failure to sufficiently explain why the factors relating to D.B.'s substance abuse (in

---

[318] *See* AR 1779–82.
[319] AR 1787.
[320] AR 1793.
[321] AR 1793–94.
[322] *Id.*
[323] *See* Pl. MSJ 24 – 25, 32–33; Pl. Opp'n 24–25.
[324] AR 1811.

addition to his other behavioral and mental health issues) improved enough to allow for treatment at a lower level of care.

### B.  The Court Will Not Consider Defendants' Post-hoc Rationales.

Defendants argue that D.B.'s post-January 4 behavior should not detract from UBH's findings. First, Defendants argue that D.B.'s primary purpose in remaining at Elevations after January 4 was for education.[325] The Plan excludes "[e]ducational/behavioral services that are focused on primarily building skills and capabilities in communication, social interaction and learning."[326] In support, Defendants cite D.B.'s discharge report, which gave the reason for discharge: he "had completed the credits for his Junior year in High School . . . and threatened to shutdown [sic] if he was kept at Elevations past completing his school credits,"[327] and a February 21 therapy note where he said "he wants to get his schoolwork done and come home."[328]

Second, Defendants contend that D.B.'s treatment after January 4 was not working because of his resistance. Defendants point to how Elevation's discharge summary concluded that he was "resistant to therapy after the first month . . . and the focus was on trying to capture some of the motivation [D.B.] had at this time."[329] Defendants characterize D.B. as someone who "d[idn't] care to change his behaviors,"[330] "hate[d] it [t]here,"[331] and "fe[lt] that treatment at Elevations [didn't] help[] him because he didn't want it to help him."[332]

---

[325] *See* Def. MSJ 37–38.
[326] AR 93.
[327] AR 1020.
[328] AR 1777; *see* AR 1776 (D.B. "continues to struggle behaviorally but is being reintegrated into programming" and "remains hyper-focused on school work and manipulating his environment to gain time to do it under the guise of attempting to complete his education and return home without facing other therapeutic issues.").
[329] AR 1020.
[330] AR 1777.
[331] AR 1768.
[332] *Id.* D.B. even told Kimberly B. on April 27 that if he is going to be a drug addict there i[s] 'nothing you can do about it'" and that treatment had not "helped him because he didn't want it to help him." AR 1790.

The court considers "only the specific rationales that were articulated in the pre-litigation appeal process documented by the administrative record."[333] Here, UBH did not make these arguments in their three denial letters. The first two letters were conclusory statements that D.B. had improved his mood and could be treated at a lower level of care.[334] The third letter was more detailed, but it only addressed purported improvement in his behavioral health, shown by a lack of suicidal and homicidal ideations, lack of substance abuse, compliance with his medication plan, and his cooperation.[335] At no point did UBH contend that he remained for academic purposes or that he was resistant to treatment after a month. For that reason, the court does not credit these arguments.

Given the Plan's level of care guidelines and the record, the court finds that UBH did not explain sufficiently why it denied coverage at Elevations RTC after January 4, 2018. UBH's decision was thus arbitrary and capricious.[336]

## REMEDY

### A. Remand Is Proper Under the Circumstances.

Plaintiffs contend that remand is improper because ERISA does not contemplate remand[337] and remand would be an advisory opinion.[338] The court disagrees. "Generally speaking, when a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator

---

[333] *Lyn M.*, 2021 WL 5579710, at *3 (citing *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)). As the Tenth Circuit explained, a "plan administrator may not 'treat the administrative process as a trial run and offer a post hoc rationale in district court.'" *Spradley*, 686 F.3d at 1140–41 (quoting *Flinders*, 491 F.3d at 1192)).

[334] *See* AR 806, 1801.

[335] *See* AR 1810–11.

[336] Having found that UBH's decision to deny coverage at Elevations was arbitrary and capricious, the court would also find under the less deferential de novo standard that Plaintiffs' claim was supported by a preponderance of the evidence. *See David P.*, 564 F. Supp. 3d at 1123.

[337] *See* Pl. Opp'n 41 (citing *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 112 (2d Cir. 2014)).

[338] *See id.* (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241–44 (1937)).

for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits."[339] As the Tenth Circuit observed, whether one of the two remedies is proper depends on the "specific flaws in the plan administrator's decision. . . . [I]f the plan administrator failed to make adequate findings or to explain adequately the grounds of its decision, the proper remedy is to remand the case to the administrator for further findings or explanation."[340] On the other hand, "a retroactive reinstatement of benefits is proper where, but for the plan administrator's arbitrary and capricious conduct, the claimant would have continued to receive the benefits or where there was no evidence in the record to support a termination or denial of benefits."[341]

Remand is proper because UBH failed to make adequate findings or explain sufficiently its decision to deny benefits at Elevations after January 4, 2018. As to Plaintiffs' request for an automatic award of benefits, the record does not show that D.B. was clearly entitled to them. Even after January 4, the record contains conflicting information.[342] The court cannot find that the record is "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."[343]

Under the circumstances of this case, the court does not find that UBH's denial of coverage for care at Elevations RTC after January 4, 2018, is supported by substantial evidence. The court must remand for UBH to provide a full and fair evaluation of Plaintiffs' claim.[344] On remand, UBH shall consider all relevant medical records, case notes, and treatment and services

---

[339] *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (cleaned up).

[340] *Id.* (cleaned up); *see Raymond M.*, 463 F. Supp. 3d at 1286 ("But the court's determination that BHO's denial of benefits was arbitrary and capricious 'does not automatically entitle Plaintiffs to the remedy they seek.'" (citation omitted)).

[341] *DeGrado*, 451 F.3d at 1176 (cleaned up).

[342] *See, e.g.*, AR 1776 (D.B. "is being reintegrated into programming . . . [h]e remains hyper-focused on school. . . [and] denies safety-related concerns); AR 1787 (describing D.B.'s leave of absence and after his return "he has been more positive, he has been respectful to his peers & staff and seems to be more optimistic about his future"); AR 1791 (nursing discharge discussing D.B.'s plan to go home and attend a partial hospital program).

[343] *Caldwell*, 287 F.3d at 1289.

[344] *See Peter E.*, 2021 WL 5962259, at *12–14.

rendered at Elevations, and provide a complete explanation as to whether and at what point D.B. no longer satisfied applicable level of care guidelines for residential treatment.[345]

**B. Whether Attorney Fees and Costs Are Appropriate Requires Further Analysis.**

ERISA authorizes an award of attorney fees and costs to either party in the court's discretion.[346] Neither party addressed the factors the court should consider or provided any material analysis, appearing to prefer to address the issue later. Accordingly, the court directs the parties to brief the issue now that they have the court's ruling.

**ORDER**

For the reasons stated above,

1. Defendants' and Plaintiffs' motions for summary judgment are GRANTED IN PART AND DENIED IN PART:

    a. For denial of UNI coverage from November 17, 2017, to December 4, 2017, the court GRANTS Defendants' motion and DENIES Plaintiffs' motion.

    b. For denial of Elevations RTC coverage from January 5, 2018, to May 4, 2018, the court DENIES Defendants' motion and GRANTS Plaintiffs' motion.

2. Defendants' decisions denying coverage at Elevations from January 5, 2018 to May 4, 2018, is VACATED and this matter is REMANDED to UBH for further proceedings consistent with this decision.

3. The parties are ordered to file briefing no later than 30 days after entry of this memorandum decision and order as to whether Plaintiffs' request for attorney fees and costs should be granted.

---

[345] *See id.* at *14.
[346] 29 U.S.C. § 1132(g)(1).

Signed September 27, 2022.

BY THE COURT

David Barlow
United States District Judge